## CLEVELAND & WESTERN COAL CO. v. MAIN ISLAND CREEK COAL CO.*

(Circuit Court of Appeals, Sixth Circuit. March 4, 1924.)

No. 3922.

1. **Appeal and error ⊂⟳1003—Weight of evidence cannot be considered by appellate court.**

   An assignment of error that the verdict is against the weight of the evidence cannot be considered by the appellate court.

2. **Appeal and error ⊂⟳237(5)—Motion for directed verdict necessary to raise question of insufficiency of evidence.**

   To raise the question in the appellate court that there was no substantial evidence to support the verdict, plaintiff in error should move for directed verdict, except to the overruling of the motion, and assign error thereon.

3. **Appeal and error ⊂⟳979(4)—Denial of new trial for insufficiency of evidence reviewable only for abuse of discretion.**

   Overruling of a motion for new trial, based on insufficiency of the evidence and weight of evidence, is not reviewable for mere error, but only for an abuse of discretion.

4. **Appeal and error ⊂⟳216(1)—Omission to instruct in particular matter reviewable only when called to attention of trial court.**

   Failure of the court to charge with respect to a particular claim of defendant is not reviewable, unless it was called to the attention of the trial court by a request to charge or an exception.

5. **Payment ⊂⟳82(4)—Voluntary payment not recoverable.**

   Where defendant voluntarily paid the full amount due plaintiff on a settlement of accounts, without deducting a sum it might have asserted as a counterclaim, it cannot plead such overpayment as a set-off in an action between the parties on a subsequent transaction.

6. **Principal and agent ⊂⟳120(1)—Testimony of principal as to instructions to agent held competent.**

   Testimony of a principal, corroborating that of his agent, as to instructions given the agent, *held* competent, where the agent had no authority, and was not held out as having authority, in the matter in which he acted, except as limited by such instructions.

7. **Appeal and error ⊂⟳205—Exclusion of evidence not considered, in absence of offer indicating what it was.**

   Exclusion of question *held* not reviewable, in absence of offer indicating the nature of the evidence excluded.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Action at law by the Main Island Creek Coal Company against the Cleveland & Western Coal Company. Judgment for plaintiff, and defendant brings error. Affirmed.

C. F. Taplin, of Cleveland, Ohio (E. L. Baker, of Cleveland, Ohio, on the brief), for plaintiff in error.

Murray Seasongood, of Cincinnati, Ohio, and John H. Holt, of Huntington, W. Va. (E. L. Hogsett, of Huntington, W. Va., on the brief), for defendant in error.

Before KNAPPEN, MACK, and DONAHUE, Circuit Judges.

MACK, Circuit Judge. Defendant in error (hereinafter designated plaintiff) was the owner and operator of various coal mines located in

Logan county, W. Va., and during the fall of 1920 was desirous of shipping as large a tonnage as possible to tidewater at Newport News, Va., for export. Plaintiff in error (hereinafter designated defendant) was engaged in the business of buying and selling coal, and during the same period controlled the output of certain mines located in Logan county, W. Va., which output was shipped inland and to ports of Lake Erie for lake shipment.

The Chesapeake & Ohio Railway Company, upon the lines of which the mines of the plaintiff and defendant were located, placed embargoes from time to time on shipments of coal to tidewater from the mines located on its line. Such embargoes were in effect from September 7, 1920, to September 20, 1920, inclusive; October 13, 1920, to October 21, 1920, inclusive, except that from October 18, 1920, to October 21, 1920, coal loaded into 70-ton cars was not embargoed; and also from October 26, 1920, to December 1, 1920, inclusive, 70-ton cars were permitted to go to tide.

During the times that these embargoes were in effect, the plaintiff, being prevented thereby from shipping its tonnage to tidewater, naturally sought to ship it inland for transshipment up the Lakes. Furthermore, effective July 26, 1920, the Interstate Commerce Commission had promulgated service order No. 10, which provided in substance, and so far as material to this case, that approximately 30 per cent. of the total output of coal mines in Logan county, W. Va., should be shipped to Lake Erie ports for transshipment by boats up the Lakes, and this service order remained in effect until October 27, 1920.

Moreover, plaintiff, desiring as much coal as possible at tidewater, was seeking to offset the requirements of service order No. 10 as far as possible; as by that order it was compelled to ship 30 per cent. of its entire output to the Lakes, it was able, when embargoes were off, to ship only 70 per cent. of its output to tide during the lake season. If, then, by arrangement with the defendant, when the embargo to tide was off, the defendant could be compelled to ship to it at tide the whole of its unrestricted output, the plaintiff would be able to get to tide the 30 per cent. it was compelled to ship to the Lakes, and perhaps more, dependent upon the capacity of the defendant's mines.

The defendant, on the other hand, wanted to get all the coal it could to the Lakes during the lake season, as deliveries after that period would do it no good. Shipments by the plaintiff to the Lakes would necessarily come to an end at the close of the lake season. As the defendant knew, the capacity and output of the plaintiff's mines were very much greater than the capacity and output of its own mines. The defendant could not, therefore, during the same period, ship as much coal to tide as the plaintiff could to the Lakes, and at the close of the lake season there would necessarily be a great balance of tonnage in favor of the plaintiff and chargeable to the defendant, if plaintiff shipped to the defendant its 30 per cent., required to be shipped to the Lakes under the service order, and its supply during tidewater embargo, up to 60,000 to 100,000 tons.

In this situation the parties concededly entered into an agreement for the exchange of coal, having a stipulated market value at the time of

shipment of $6 a ton. Plaintiff contends that the agreed time for shipment by *either* party was limited to the 1920 season of lake navigation, which ended November 16, 1920, and that $6 per ton was the agreed price to be paid for the excess shipments; defendant contends that the parties contemplated approximately equal shipments, and that consequently defendant's shipments were not limited to the season of lake navigation, but might be made within a reasonable time thereafter; that, though $6 was the fair market value of coal during that season, this figure was agreed upon and so specified in the documents as a mere bookkeeping bill price.

As against plaintiff's claim for something over $400,000, the value at $6 a ton, and interest, of the 60,000-odd tons, concededly shipped by plaintiff in excess of defendant's shipments of some 8,500 tons during the lake navigation season, defendant claimed credit for some 3,100-odd tons actually shipped by it shortly thereafter (hereinafter referred to as the Panhandle shipment), and for the difference between $6 per ton and approximately $120,000 received by it for the 57,000-odd tons which it alleged it had mined, shipped, and sold at going market prices within a reasonable time after the close of lake navigation. It tendered, in its pleadings, some $90,000 being the balance of $119,000 conceded by it to be due plaintiff, less some $29,000 claimed by way of set-off as due from plaintiff to it on a 1919 transaction. Plaintiff denied the set-off, and contended that in any case the amount in question had been the subject of a complete accord and satisfaction, or voluntary payment by defendant, so as to bar recovery or set-off thereof.

The verdict awarded the plaintiff the full amount claimed, with interest; in answer to questions propounded at defendant's request, the jury specially found that defendant had specifically agreed to replace, on or before the close of lake navigation, the coal received by it, and that nothing was allowed defendant on its claim of set-off arising out of the 1919 transactions.

[1] 1. The question stressed in defendant's brief, that the verdict is against the weight of the evidence, cannot be considered in this court. Troxell v. Delaware, etc., R. R. Co., 227 U. S. 434, 445, 33 Sup. Ct. 274, 57 L. Ed. 586.

[2] 2. To raise the question in this court that there was no substantial evidence to support the verdict, defendant should first have directed the attention of the trial court thereto by motion for a directed verdict, and then have excepted to the overruling of the motion and assigned error thereon. Mercantile Trust Co. v. Hensey, 205 U. S. 298, 27 Sup. Ct. 535, 51 L. Ed. 811, 10 Ann. Cas. 572. None of these steps were taken.

[3] 3. A motion for a new trial on the grounds both of insufficient evidence and weight of evidence was overruled, the trial judge holding that the verdict was not against the weight of the evidence. Mere error in the disposition of such a motion is not reviewable; only an abuse of the court's discretion. Howard v. U. S. (C. C. A.) 271 Fed. 301, 302. If it clearly appeared that there was not only no preponderance of, but indeed no substantial, evidence to support the verdict, the action of the court might have been charged to be an abuse of discretion,

and as such assigned as error. Waiving the nonassignment of such error, it is apparent on this record that it cannot be sustained; there was no such abuse of discretion.

Plaintiff's original telegram of September 6th offers to ship heavily to the Lakes during tidewater embargo, if defendant will exchange during time plaintiff is permitted to export, and telegram of the 7th offers, if defendant will give its coal during time tidewater is open, to *replace* same with shipments to the Lakes when embargo is on. Plaintiff's letter of the 7th says:

"My proposition is this: That you ship to pools 5 or 7, Newport News Coal Exchange, account Dalton-Kelly Coal Corporation, Newport News, Va., all possible Logan county coal during the time that tidewater is open, and this coal will be replaced to you ton for ton while tidewater is embargoed and during the present season of lake navigation."

On October 22d defendant wired plaintiff:

"Can we not make arrangements after this week to return coal to you at tidewater *after close of lake navigation* in order to accumulate all possible coal Lake Erie ports next three or four weeks including all you can possibly ship?"

Oral testimony offered by defendant and tending to sustain its interpretation of the agreement was admitted by the court. While the documentary evidence is ambiguous, we cannot say that, read in the light of the situation of the parties hereinabove narrated, and of the circumstances hereinafter stated, there was no substantial evidence to sustain the verdict. As the trial judge points out in overruling the motion for a new trial, the excess coal delivered by plaintiff was worth, and doubtless brought to the defendant, much more than $6 a ton, without any expenditure of labor for mining and delivering it. Furthermore, the decided break in the price after the close of lake navigation was natural, in view of the increase thus afforded in the supply of tidewater coal. In these circumstances, the interpretation of the contract as found by the jury, that the difference was to be settled for in cash and not by a later exchange, was not deemed by the trial court, and cannot be held by us to be contrary to the reasonable contemplation of the parties.

[4] 4. Defendant now contends that, in any event, it is entitled to about $21,000 credit for the Panhandle shipment, on the ground that plaintiff, through its agent, the Panhandle Company, accepted the shipment. In charging the jury, the court made no specific reference to the Panhandle shipment; they were told that, if plaintiff's interpretation of the contract was found by them to be correct, defendant was entitled to credit only for shipments made before the close of lake navigation. Neither by request to charge, nor by exception, did defendant direct the court's attention to its present claim in respect to the Panhandle shipment; the absence of any reference thereto in the opinion denying the motion for a new trial, as well as in the assignments of error, indicates that the matter is now attempted to be brought forward for the first time. Defendant is too late.

On the merits, however, the jury, under proper instructions in respect thereto, might well have found in favor of plaintiff. In view of the special finding of the jury, plaintiff was not obligated to accept any

shipment made after November 16th. These shipments were so made; true, they were made under a permit theretofore given by plaintiff, but, as the stipulation of facts recites, though received in the Newport News pools, they were refused by the Panhandle Company. Furthermore, though later loaded into vessels, this was done without any directions from either plaintiff or defendant or the Panhandle Company, and none of these companies has been credited or paid therefor. Unless plaintiff itself, or by its licensee, the Panhandle Company, actually accepted the coal shipped after the contract time, it is not to be charged therewith; here, instead of accepting, the Panhandle Company refused the coal, and neither it nor plaintiff had anything further to do with it. Should plaintiff, however, hereafter receive anything on account of this Panhandle shipment, it will become liable therefor to defendant as moneys received to its use.

[5] 5. Exception was duly taken to the court's charge in reference to the set-off. Concededly defendant was entitled to make a reasonable handling cost charge of some $29,000 on the half million tons of coal handled by it for plaintiff in the year 1919, if it had asserted this right at the time of the settlement of the 1919 accounts. But the court charged the jury that, if the defendant voluntarily paid plaintiff the balance of $46,000 due on this account, without making the deduction of $29,000, and voluntarily withdrew its claim, then, even though it did so without an agreement, but with the hope and expectation, subsequently realized, that plaintiff would ship more coal in 1920, the set-off could not be sustained; that it was sustainable only if the payment were made by defendant, not voluntarily, but unintentionally, and not under the circumstances described. The burden of proof that the relinquishment was voluntary was placed on plaintiff.

The charge is an accurate statement of the law of voluntary payments. Such a payment requires no consideration. Assuming, as we must, that the $29,000 might have been deducted from and as a charge against the $46,000 balance otherwise due plaintiff on the 1919 transactions, payment of the entire $46,000 with full knowledge of the situation, even though an overpayment of the amount actually due, gives rise to no action for recovery of that part which constitutes the overpayment. Lamborn v. County Commissioners, 97 U. S. 181, 185, 24 L. Ed. 926. There is here involved no question of delivery, symbolical or otherwise, of a chose in action; the money was paid; if it was in effect a gift, it was a completed gift of money, not an attempted gift of a claim. It is immaterial, too, that this handling charge could not have been made and deducted each time coal was paid for, and that therefore the cost of the coal and the handling are separate and distinct counterclaims; for, when final settlement of the 1919 transactions was made, there was a balance due plaintiff, whether for the purchase price of the coal independently of the handling charge, or for the purchase price less the handling charge. The account was a single one; the payment was for the balance due as between the parties; there was substantial evidence from which the jury was justified in finding, as it did, that in making the payment defendant, by deliberately and intentionally waiving its claim for a handling charge, voluntarily paid plaintiff what

it might have retained. See Marmet Coal Co. v. People's Coal Co., 226 Fed. 646, 141 C. C. A. 402; Benton Harbor-St. Joseph Gas & Fuel Co. v. Coal Co. (C. C. A.) 271 Fed. 216; Lazarus Liquor Co. v. Kessler & Co. (C. C. A.) 269 Fed. 520. Whether an action for recovery thereof be based upon the original claim, or upon an alleged overpayment, is immaterial; in effect, it is an action to recover money paid—in this case, money voluntarily and deliberately paid, and therefore not recoverable.

[6] 6. Over objection, plaintiff's president, Dalton, stated the instructions he had given its agent, Riggs, to communicate to defendant's agent, Taplin, in negotiating the contract, to the effect that he "make the contract so that, if any amount of coal was shipped over by either party, it was to be settled for at the end of the lake season at $6 a ton." The objection was properly overruled; Riggs, as he testified, was not a general sales or contract agent, but traffic manager; his authority to negotiate the contract was limited by his instructions. Furthermore, called as a witness by defendant, he had testified to the instructions given; while the details as to which Dalton contradicted him were brought out on cross-examination, the fact that he telephoned Taplin "upon Dalton's request to work out an arrangement to ship 60,-000 to 100,000 tons of coal on an exchange basis," was elicited on his direct examination. Furthermore, Riggs' signed memoranda of the telephone conversation with Taplin, admitted in evidence, are in accordance with the instructions as testified to by Dalton. In these circumstances, Dalton's testimony was properly admitted, as the trial judge stated, "to contradict, or, if not contradicting, at least giving his version of, what Mr. Riggs testified to, and competent under any view of the case."

[7] 7. After the signed memoranda of the Riggs-Taplin telephone talk had been introduced on Riggs' cross-examination, he was asked on redirect for the substance of an affidavit which he stated was the subject-matter of a conversation with Angell, plaintiff's acting sales manager, at the time the latter asked him to sign the memoranda. Objection was sustained both to this question and to any conversation between them at that time as too remote and immaterial. In the absence of any offer indicating the nature of, and therefore the relevancy or materiality of, this evidence, no reviewable question is presented. Herencia v. Guzman, 219 U. S. 44, 31 Sup. Ct. 135, 55 L. Ed. 81.

Judgment affirmed.